PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-5

WILLIAM LEROY BARNES,

             Petitioner - Appellant,

     v.

CARLTON JOYNER, Warden, Central Prison, Raleigh, North
Carolina,

             Respondent – Appellee.

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  Thomas D. Schroeder,
District Judge.  (1:08-cv-00271-TDS-JEP)

Argued:  January 29, 2014              Decided:  May 5, 2014

Before AGEE, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion.  Judge Thacker wrote
the opinion, in which Judge Floyd joined.  Judge Agee wrote a
dissenting opinion.

**ARGUED**: Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE &
FIALKO, Chapel Hill, North Carolina, for Appellant.  Jonathan
Porter Babb, Sr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellee.  **ON BRIEF**: George B. Currin,
CURRIN & CURRIN, PA, Raleigh, North Carolina, for Appellant.
Roy Cooper, Attorney General, NORTH CAROLINA DEPARTMENT OF
JUSTICE, Raleigh, North Carolina, for Appellee.

THACKER, Circuit Judge:

Petitioner William Leroy Barnes ("Barnes"), an inmate on North Carolina's death-row, appeals the district court's denial of his petition for writ of habeas corpus against Carlton Joyner, Warden of the Central Prison in Raleigh, North Carolina (hereinafter, the "State"). In 1994, after a jury trial in North Carolina state court, Barnes was convicted of first-degree murder and sentenced to death. Immediately after the jury returned its sentencing recommendation, Barnes alleged to the state trial judge that one of the jurors discussed the death penalty with her pastor the previous day. The trial court denied Barnes' request to inquire further into the matter. The Supreme Court of North Carolina affirmed Barnes' conviction and sentence on direct appeal, concluding, among other things, that Barnes had not proven that the alleged contact between the juror and her pastor prejudiced Barnes or denied him the right to an impartial jury.

In February 1999, Barnes sought state post-conviction relief on various grounds by filing a Motion for Appropriate Relief. In his Motion for Appropriate Relief, Barnes reasserted his claim of juror misconduct and presented additional evidence to demonstrate that a sitting juror improperly communicated with her pastor about the death penalty during the sentencing phase of Barnes' trial and then relayed the information to other

2

jurors.  Despite this additional information, the state post-conviction court summarily denied Barnes' claim without conducting an evidentiary hearing, adopting the same analysis as the Supreme Court of North Carolina.

After considering the various arguments raised in Barnes' federal habeas petition, the district court concluded that the state court's adjudication of Barnes' juror misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law.  However, the district court granted a certificate of appealability, pursuant to 28 U.S.C. § 2253(c)(2), on the issue of whether a juror's contact with her pastor violated Barnes' Sixth Amendment right to a fair trial.

For the reasons that follow, we conclude that the state post-conviction court's failure to apply a presumption of prejudice and failure to investigate Barnes' juror misconduct claim, which was based on an external influence on the jury, was an unreasonable application of clearly established federal law. Therefore, we reverse the district court's judgment and remand for an evidentiary hearing to determine whether the state court's failures had a substantial and injurious effect or influence on the jury's verdict.

On October 30, 1992, at around 12:30 a.m., police officers from Salisbury, North Carolina, found B.P. and Ruby Tutterow shot to death in their home. The house was ransacked, and a number of the Tutterows' belongings were missing. Later that day, Barnes and his co-defendants, Frank Junior Chambers and Robert Lewis Blakney, were arrested in connection with the killings. Each defendant was subsequently indicted on two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of first-degree burglary. After a joint capital trial, the jury returned verdicts finding Barnes and his co-defendants guilty of all charges, including first-degree murder on the theory of premeditation and under the felony murder rule. Barnes' guilt is not at issue here.[1]

This capital trial proceeded to the sentencing phase, where the jury was charged with determining whether the crimes committed by Barnes and his co-defendants warranted a sentence of death or of life imprisonment. See N.C. Gen. Stat. § 15A-2000. During the closing arguments of the sentencing phase, an

---

[1] The Supreme Court of North Carolina summarized the facts underlying Barnes' conviction in its opinion denying Barnes relief on direct appeal. See State v. Barnes, 481 S.E.2d 44, 51-53 (N.C. 1997), cert. denied, 523 U.S. 1024 (1998).

attorney representing co-defendant Chambers stated, in pertinent part, as follows:

> If you're a true believer and you believe that Frank Chambers will have a second judgment day, then we know that all of us will too. All of us will stand in judgment one day. And what words is it that a true believer wants to hear? ["]Well done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven.["] Isn't that what a true believer wants to hear? Or does a true believer want to explain to God, ["]yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, Thou shalt not kill, but I did it because the laws of man said I could.["] You can never justify violating a law of God by saying the laws of man allowed it. If there is a higher God and a higher law, I would say not.
>
> To be placed in the predicament that the State has asked you to place yourself in, is just that. To explain when your soul is at stake. ["]Yes, I know the three that I killed were three creatures of yours, God. And that you made them in your likeness. I know you love us all, but I killed them because the State of North Carolina said I could.["] Who wants to be placed in that position? I hope none of us. And may God have mercy on us all.

J.A. 1532-33.[2] The prosecution did not object at any point during this argument.

The next day, the jury recommended that Barnes and Chambers be sentenced to death for each murder and that Blakney be sentenced to a mandatory term of life imprisonment for each

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

murder.  After the jury returned its sentencing recommendations and exited the courtroom, the following colloquy took place between the court and defense counsel:

THE COURT: I take it everyone wants to enter some Notice of Appeal.  Is that correct?

MR. HARP [CHAMBERS' COUNSEL]:  The first thing we would like to get in is that late yesterday afternoon we were informed, after talking to alternate jurors, that on Tuesday, before deliberation and before instructions were given by the Court, one of the jurors carried a Bible back into the jury room and read to the other jurors from that.  That it was also discovered by us that one of the jurors, one of the other jurors, called a member of the clergy, perhaps a relative of hers, to ask her about a particular question as to the death penalty.  We also informed you of it this morning at ten o'clock and that we need to enter that on the record for purposes of preserving that.

MR. FRITTS [BARNES' COUNSEL]: Judge, for Mr. Barnes we join in on that.  We would for those reasons make a Motion for Mistrial and we would request the Court to inquire of the jurors, and I understand the Court's feelings on that, but that would be our request.

THE COURT: No evidence that anybody discussed the particular facts of this case with anybody outside the jury.  Is that correct?

MR. HARP: No evidence that they did or did not as far as the conversation with the minister is concerned.

THE COURT: No evidence that they did though.  Is that correct?

MR. HARP: No, sir.

THE COURT: All right.  Well, I'm going to deny the request to start questioning this jury about what may or may not have taken place during their deliberations of this trial.

J.A. 1601-03. Thereafter, the trial court denied the defense's post-sentence motions and rejected their request to conduct an evidentiary hearing with respect to juror misconduct.

On March 10, 1994, the court sentenced Barnes and Chambers to death, and Blakney to life imprisonment, for their first-degree murder convictions. In addition, each defendant was sentenced to two terms of forty years' imprisonment for armed robbery and one term of forty years' imprisonment for burglary. All sentences were to be served consecutively.

B.

Barnes appealed his conviction and sentence to the Supreme Court of North Carolina on various grounds. Relevant here is Barnes' Sixth Amendment juror misconduct argument, which was based on two alleged occurrences: first, that a "juror called a minister to ask a question about the death penalty;" and second, "that a juror had taken a Bible into the jury room and read to the jury members from it before deliberations." State v. Barnes, 481 S.E.2d 44, 66 (N.C. 1997). Barnes argued that "the trial court erred in failing to conduct an investigation to determine what, if any, prejudice resulted from the alleged events." Id. at 67. The Supreme Court of North Carolina disagreed, offering the following reasoning:

> Assuming arguendo that defense counsel's assertions were accurate, there still was no assertion that the juror's reading from the Bible was accomplished in the

7

context of any discussion about the case itself or that it involved extraneous influences as defined by this Court. The issue, therefore, is whether the trial court abused its discretion by failing to inquire further into the alleged Bible-reading incident when faced with the mere assertion that a juror read the Bible aloud in the jury room prior to the commencement of deliberations and prior to the trial court's instructions to the jury. As there is no evidence that the alleged Bible reading was in any way directed to the facts or governing law at issue in the case, we cannot say that the trial court's actions were an abuse of discretion.

With respect to a juror's alleged actions in calling a clergy member, a similar analysis applies. The trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty. Nothing in this assertion involved "extraneous information" as contemplated in [North Carolina Rule of Evidence] 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case. We cannot say under the particular circumstances of this case that the trial court's actions in failing to probe further into the sanctity of the jury room was an abuse of discretion. These assignments of error are therefore without merit.

Id. at 68.

The Supreme Court of North Carolina likewise rejected Barnes' other contentions on direct appeal and affirmed his conviction and sentence on February 10, 1997. Barnes, 481 S.E.2d at 51, 82. On March 23, 1998, the Supreme Court of the United States denied Barnes' petition for a writ of certiorari. See Barnes v. North Carolina, 523 U.S. 1024 (1998).

8

In February 1999, Barnes sought state post-conviction relief on various grounds, filing a Motion for Appropriate Relief ("MAR") in Rowan County Superior Court (the "MAR Court").[3] Barnes amended his MAR on January 24, 2001, and again on September 4, 2002.[4] With respect to his claim of juror misconduct, Barnes offered new information to the MAR Court to try to demonstrate that Hollie Jordan ("Juror Jordan"), a sitting juror, improperly communicated with her pastor about the death penalty during the sentencing phase of Barnes' trial. This new information was presented through a number of exhibits compiled by post-conviction counsel and their investigator, which were based on post-verdict interviews with several of the jurors.[5]

---

[3] A MAR is North Carolina's procedural mechanism for state post-conviction review. See N.C. Gen. Stat. §§ 15A-1401, 1411. Although a "MAR is not identical to a habeas corpus petition, . . . it provides an avenue to obtain [post-conviction] relief from 'errors committed in criminal trials.'" Conaway v. Polk, 453 F.3d 567, 576 n.8 (4th Cir. 2006) (quoting N.C. Gen. Stat. § 15A-1401).

[4] For simplicity, we refer to the most current version as the "MAR."

[5] For purposes of Barnes' habeas petition, we assume the truth of the factual allegations contained in his evidentiary affidavits presented to the MAR Court. See Robinson v. Polk, 438 F.3d 350, 358 (4th Cir. 2006) (citing Bacon v. Lee, 225 F.3d 470, 485 (4th Cir. 2000)).

One of the exhibits attached to Barnes' MAR was an "Interview Summary" of a May 31, 1995 interview of Juror Jordan.[6] According to the Interview Summary, Juror Jordan was offended by the closing argument in which co-defendant Chambers' attorney argued "that if jurors voted for the death penalty, they would one day face God's judgment for killing these defendants." J.A. 1898. Although Juror Jordan "did not accept the attorney's argument," she did notice "that another juror, a female, seemed visibly upset" by it. Id. "To remedy the effect of the argument, [Juror] Jordan brought a Bible from home into the jury deliberation room" and read a passage to all the jurors, which provided "that it is the duty of Christians to abide by the laws of the state." Id. The Interview Summary does not mention any conversation with Juror Jordan's pastor; it states that Juror Jordan knew the Bible passage from church.

In addition to Juror Jordan's Interview Summary, Barnes' MAR relied on a September 7, 2000 affidavit from Daniel C. Williams ("Investigator Williams"), an investigator hired by Barnes' post-conviction counsel. In his affidavit, Investigator Williams described interviews he conducted with three jurors

---

[6] On June 1, 2000, Juror Jordan signed the bottom of the Interview Summary, acknowledging, "[t]he summary is an accurate description of what [she] said to Janine Crawley and Alexander McCoy [members of Barnes' direct appeal team] on May 31, 1995." J.A. 1898.

10

from Barnes' trial, including Juror Jordan. According to Investigator Williams, Juror Jordan explained, "she called her pastor Tom Lomax" ("Pastor Lomax") in response to a defense attorney's closing argument in which the attorney "suggested that if jurors returned a death sentence, they, the jurors[,] would one day face judgment for their actions." J.A. 1892. Juror Jordan stated that she "discussed the lawyer's argument with [Pastor] Lomax." Id. During their conversation, "[Pastor] Lomax told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney." Id. The next day, Juror Jordan brought her Bible into the jury deliberation room and "read the passage suggested to her by [Pastor] Lomax to all of the jurors." Id.

Investigator Williams also interviewed jurors Leah Weddington ("Juror Weddington") and Ardith F. Peacock ("Juror Peacock"), both of whom recalled that a member of the jury brought a Bible into the jury room during sentencing deliberations. Juror Weddington told Investigator Williams that "[t]he person who brought in the Bible read a passage to a juror who was having a hard time with the death penalty." J.A. 1892-93. Juror Peacock could not recall the details of the verse, but she stated that it "dealt with life and death." Id. at 1893. In a separate affidavit dated April 7, 2004, Juror Peacock stated that a defense attorney's remarks that jurors

11

would have to face God's judgment if they imposed the death penalty "made the jury furious." Id. at 1900. In response to this argument, one of the jurors read a passage from the Bible to the other jurors. Juror Peacock did not recall which juror brought the Bible or the exact verse that was read.

Investigator Williams also interviewed Pastor Lomax. Pastor Lomax confirmed that Juror Jordan attends his church. Moreover, although Pastor Lomax "could not recall the conversation recounted by [Juror] Jordan," he "stated that it [was] possible that he did talk to her about the death penalty while she was a juror, but he simply does not remember it." J.A. 1893.

Barnes' MAR also attached an October 10, 2000 affidavit of Cynthia F. Adcock, an attorney with the North Carolina Resource Center, which recounted interviews with several jurors. According to Ms. Adcock, in a February 25, 1995 interview, Juror Weddington stated that "a juror named 'Hollie' brought a Bible into the jury room and read from it" and that "Hollie also talked to her pastor during the case." J.A. 1902. Additionally, Ms. Adcock's affidavit explains that in a separate February 25, 1995 interview, Juror Wanda Allen ("Juror Allen") "recalled discussions about the fact that one of the jurors had brought in a [B]ible and had talked with her pastor." Id.

12

Relying on this new information, Barnes contended that there was juror misconduct during the sentencing phase of his trial. On March 19, 2007, the MAR Court held an evidentiary hearing on some, but not all, of the claims raised in Barnes' MAR. Importantly, the MAR Court did not conduct an evidentiary hearing on Barnes' juror misconduct claim.

Instead, the MAR Court "summarily denied" the juror misconduct claim, holding that it was "procedurally barred and without merit" under N.C. Gen. Stat. § 15A-1419(a)(2) because the issue had previously been addressed and rejected by the Supreme Court of North Carolina on direct appeal.[7] J.A. 1882-83. The MAR Court further concluded that Barnes' "argument that there is now additional evidence which was not available at that

---

[7] Pursuant to North Carolina law, a claim is "procedurally barred" for purposes of MAR review if, among other things, "[t]he ground or issue underlying the motion was previously determined on the merits upon an appeal from the judgment or upon a previous motion or proceeding in the courts of this State or a federal court." N.C. Gen. Stat. § 15A-1419(a)(2). As we have recognized, "[a]lthough North Carolina courts refer to the subsection 15A-1419(a)(2) bar as a 'procedural bar' for purposes of reviewing a state court defendant's MAR, it is not a state procedural bar for purposes of federal habeas review." Brown v. Lee, 319 F.3d 162, 170 n.2 (4th Cir. 2003). Subsection (a)(2) simply precludes MAR review -- not federal habeas review -- of a claim that was previously raised by a state defendant and rejected on the merits. Id. (explaining that subsection (a)(2) "states a rule of res judicata and law of the case, precluding re-litigation of the claim [through] the MAR proceeding"). Therefore, we are not precluded from reviewing Barnes' juror misconduct claim.

13

time is without foundation or support, and [Barnes] seeks to present anew the same contentions and inferences raised in his initial appeal." Id. at 1883. The court explained, "[t]he allegedly new evidence adds nothing to the issue as it was presented during [Barnes'] original appeal, and the allegations are subject to the same analysis inherent in [the Supreme Court of North Carolina's] decision." Id. Consequently, the MAR Court entered an order on May 31, 2007, denying all claims raised in Barnes' MAR. On March 6, 2008, the Supreme Court of North Carolina denied Barnes' request for certiorari review. See State v. Barnes, 660 S.E.2d 53 (N.C. 2008).

D.

On April 17, 2008, Barnes filed a Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of North Carolina. Just as he did in his MAR, Barnes raised a number of challenges to his conviction and sentence, including juror misconduct during his sentencing. On February 3, 2012, a United States Magistrate Judge issued a report and recommendation, recommending that all claims in the petition be denied. Barnes v. Branker, 1:08-CV-271, 2012 WL 373353, at *39 (M.D.N.C. Feb. 3, 2012). On March 28, 2013, after concluding that the issues raised by Barnes did not require a hearing, the district court adopted the magistrate judge's recommendation and issued an

14

opinion and order denying Barnes' habeas petition. See Barnes v. Lassiter, 1:08-CV-00271, 2013 WL 1314466, at *6-7, *20 (M.D.N.C. Mar. 28, 2013). The district court, however, granted a certificate of appealability ("COA"), pursuant to 28 U.S.C. § 2253(c)(2), on the issue of whether a juror's contact with her pastor violated Barnes' Sixth Amendment right to a fair trial. Id. at *20. Barnes timely appealed.[8] We possess jurisdiction pursuant to 28 U.S.C. § 2253.

## II.

## A.

"We review de novo the district court's application of the standards of 28 U.S.C. § 2254(d) to the findings and conclusions of the MAR court." McNeill v. Polk, 476 F.3d 206, 210 (4th Cir. 2007). In conducting our habeas review, we are restricted to the question of whether a state prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see also Estelle v. McGuire, 502 U.S. 62, 68 (1991). Moreover, because we are engaging in collateral review of a state court adjudication, our

---

[8] In his Opening Brief, Barnes requested an additional COA from this Court, seeking consideration of a claim relating to a Batson violation. See Batson v. Kentucky, 476 U.S. 79, 89 (1986) (prohibiting purposeful racial discrimination in jury selection as a violation of the Equal Protection Clause). We denied Barnes' request for an additional COA and struck the Batson claim from Barnes' brief.

15

authority to grant relief is constrained by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See DeCastro v. Branker, 642 F.3d 442, 449 (4th Cir. 2011) (citing 28 U.S.C. § 2254(d)). Under AEDPA, we may grant habeas relief on a claim that has been previously adjudicated "on the merits"[9] in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[10]

---

[9] Barnes argued in the district court that the MAR Court "failed to adjudicate the merits of [his] properly presented claim and, thus, [the district court] must review [his claim] de novo." J.A. 2135 n.7. However, as the district court correctly concluded, the MAR Court did in fact adjudicate the merits of Barnes' juror misconduct claim. Indeed, the MAR Court concluded that the claim was "procedurally barred and without merit" because it "was presented in [his] direct appeal . . . and was directly addressed by the Supreme Court of North Carolina and rejected by that court." Id. at 1882-83. With respect to Barnes' new evidence, the MAR Court noted that it "add[ed] nothing to the issue as it was presented during [Barnes'] original appeal." Id. at 1883. The MAR Court therefore incorporated the "same analysis inherent in [the direct appeal]" to the new evidence. Id. This was an adjudication on the merits, though it was done summarily and by incorporating the Supreme Court of North Carolina's earlier analysis. See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000) (en banc) (explaining that even a summary adjudication, where "the state court fails to articulate the rationale behind its ruling," is an adjudication on the merits for purposes of § 2254(d) deference).

[10] We may also grant relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Subsection (d)(2) is not implicated in this appeal.

16

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or if it reaches a different result than the Supreme Court previously reached on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 413 (2000). Further, a state court's decision is an "unreasonable application" of clearly established federal law when the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. This means that to obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." White v. Woodall, --- U.S. ---, No. 12-794, 2014 WL 1612424, at *4 (Apr. 23, 2014) (internal quotation marks omitted).

Under the unreasonable application clause of § 2254(d)(1), we look to whether the state court's application of law was "objectively unreasonable" and not simply whether the state court applied the law incorrectly. Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006); see also Williams, 529 U.S. at 411 (explaining that "a federal habeas court may not issue the

17

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). The phrase "clearly established Federal law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

B.

Even if we conclude that the state court's adjudication was contrary to, or an unreasonable application of, clearly established federal law, our inquiry is not over. As we have observed, "'most constitutional errors can be harmless.'" Bauberger v. Haynes, 632 F.3d 100, 104 (4th Cir. 2011) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991)). Therefore, "we are not permitted to grant habeas relief unless we are convinced that the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). This means that before a federal court grants habeas relief, it must conclude that the state court's constitutional error "actually prejudiced" the habeas petitioner. Bauberger, 632 F.3d at 104 ("Because of the threat collateral attacks pose to 'finality, comity, and federalism,' habeas petitioners may secure the writ only if the

18

error 'actual[ly] prejudice[d]' them." (internal citations omitted and alterations in original)). It is under this framework that we examine Barnes' claim of juror misconduct.

III.

Barnes argues that under the Sixth and Fourteenth Amendments to the United States Constitution, he was deprived of his right to an impartial jury at his capital sentencing because at least one juror improperly communicated with her pastor and relayed the information obtained from her pastor to the rest of the jury. As a result, Barnes contends that the jury considered extraneous information that the parties did not introduce at trial. Relying on the Supreme Court's decision in Remmer v. United States, 347 U.S. 227 (1954), Barnes contends that the MAR Court unreasonably applied clearly established federal law by failing to attach a presumption of prejudice upon his showing of an extraneous influence on the jury (the "Remmer presumption"). In a related, but distinct argument, Barnes also contends that the MAR Court unreasonably applied clearly established federal law by failing to order the state trial court to hold a hearing on juror misconduct, during which Barnes would be entitled to the Remmer presumption, or, at a minimum, during which he would have the opportunity to prove the prejudicial impact of the extraneous influence.

19

The State counters by first arguing that there is no clearly established federal law applicable to the situation presented in the instant case. Thus, according to the State, the MAR Court's adjudication of Barnes' juror misconduct claim necessarily could not have been contrary to, or an unreasonable application of, clearly established federal law. The State next argues that even if there is clearly established federal law applicable here, the MAR Court did not unreasonably apply such law because the communication between the juror and her pastor was not "about the matter pending before the jury." See Remmer, 347 U.S. at 229 (emphasis supplied). According to the State, this means Barnes was entitled to neither the Remmer presumption, nor to a hearing on the issue of juror misconduct. Finally, the State contends that the district court correctly applied the AEDPA standard -- which requires proof of a "substantial and injurious effect" on Barnes' sentencing in order to grant habeas relief -- and that, therefore, an evidentiary hearing in the district court was not required.

In light of our review under AEDPA, as well as the parties' arguments summarized above, we must address the following three issues: (1) whether there was clearly established federal law governing Barnes' juror misconduct claim at the time of the MAR Court's adjudication; (2) if so, whether the MAR Court acted contrary to this clearly established law, or

applied it unreasonably, in failing to order a hearing or apply a presumption of prejudice after Barnes presented allegations that a juror communicated with her pastor about the death penalty during Barnes' sentencing; and (3) whether this error had a substantial and injurious effect on Barnes' sentencing. See Hall v. Zenk, 692 F.3d 793, 799 (7th Cir. 2012) (employing this three-step analysis on federal habeas review).

A.

Clearly Established Federal Law

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." (internal quotation marks omitted)); Turner v. Louisiana, 379 U.S. 466, 471-73 (1965). An impartial jury is one that arrives at its verdict "based upon the evidence developed at trial" and without external influences. Irvin, 366 U.S. at 722; see also Remmer, 347 U.S. at 229. "No right touches more the heart of fairness in a trial," Stockton v. Virginia, 852 F.2d 740, 743 (4th Cir. 1988), and this right applies equally to sentencing proceedings that are tried to a

21

jury, Robinson v. Polk, 438 F.3d 350, 359 (4th Cir. 2006) (citing Morgan v. Illinois, 504 U.S. 719, 727-28 (1992)).

It is clearly established under Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury. See, e.g., Parker v. Gladden, 385 U.S. 363, 364-66 (1966) (per curiam); Turner, 379 U.S. at 472-73; Remmer, 347 U.S. at 229. Especially troubling are private communications between a juror and a third party. See Fullwood v. Lee, 290 F.3d 663, 677 (4th Cir. 2002) ("The Supreme Court has clearly stated that private communications between an outside party and a juror raise Sixth Amendment concerns." (citing Parker, 385 U.S. at 364)). Indeed, it is well established that "'private talk, tending to reach the jury by outside influence' is constitutionally suspect." Id. (quoting Parker, 385 U.S. at 364). The Supreme Court recognized this as early as 1892 when it declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140, 150 (1892).

1.

In light of these significant constitutional concerns, the Supreme Court in _Remmer_ created a rebuttable presumption of prejudice applying to communications or contact between a third party and a juror concerning the matter pending before the jury. _Remmer_, 347 U.S. at 229; _see also_ _Fullwood_, 290 F.3d at 678 (explaining that the Supreme Court adopted the _Remmer_ presumption "[b]ecause the potential for mischief is so great when a third party establishes private, extrajudicial contact with a juror").

In _Remmer_, a juror reported to the district judge that an unnamed third party suggested to the juror that he could profit by returning a defense verdict. 347 U.S. at 228. The judge assigned an FBI agent to investigate the incident, and the agent reported to the judge "that the statement to the juror was made in jest." _Id._ The agent's report was reviewed by the judge and the prosecutor but was not disclosed to defense counsel. _Id._ After trial, the defendant became aware of the incident and filed a motion for a new trial in which he requested a hearing "to determine the circumstances surrounding the incident and its effect on the jury." _Id._ Without holding the requested hearing, the district court denied the motion. _Id._ at 229. The Ninth Circuit affirmed, holding that the district court did not abuse its discretion in denying the

23

motion for a new trial because the defendant failed to show prejudice.  See Remmer v. United States, 205 F.2d 277, 291 (9th Cir. 1953), vacated, 347 U.S. 227 (1954).

The defendant appealed to the Supreme Court, which vacated the Ninth Circuit's judgment and remanded the case for a hearing.  Remmer, 347 U.S. at 229-30.  Specifically, the Court stated, "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  Id. (emphasis supplied).  "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  Id. (emphasis supplied) (citing Mattox, 146 U.S. at 148-50).[11]  No such hearing was conducted by the district court

---

[11] As we have observed, the rules of evidence "make it difficult for either party to offer direct proof of the impact that an improper contact may have had on the deliberations of the jury."  Stockton, 852 F.2d at 743-44; see also Robinson, 438 F.3d at 359-60.  This is because both the Federal Rules of Evidence and the North Carolina Rules of Evidence prohibit a juror from testifying about his or her mental processes concerning the verdict.  See Fed. R. Evid. 606(b); N.C. Gen. Stat. § 8C-1, Rule 606(b).  There is an exception, however, that permits a juror to testify about "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror."  N.C. Gen. Stat. § 8C-1, Rule 606(b); see Fed. R. Evid. 606(b).

24

in Remmer. As a result, the Supreme Court "[did] not know from this record, nor [did] the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless." Id. at 229.

The Court further noted that when allegations of juror partiality come to light, "[t]he trial court should not decide and take final action ex parte on information such as was received in this case." Remmer, 347 U.S. at 229-30. Instead, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Id. at 230. The Supreme Court remanded the case to the district court with instructions that it hold a hearing to determine whether the incident was harmful to the defendant. Id. The case eventually made its way back up to the Supreme Court, at which time the Court explained that "[i]t was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in [the Court's] view, made manifest the need for a full hearing." Remmer v. United States ("Remmer II"), 350 U.S. 377, 379-80 (1956).

Thus, Remmer clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible

25

allegation of communications or contact between a third party and a juror concerning the matter pending before the jury. We proceed to discuss each of these aspects of Remmer in turn.

a.

With respect to the presumption of prejudice, we have recently observed, "there is a split among the circuits regarding whether the Remmer presumption has survived intact following" the Supreme Court's decisions in Smith v. Phillips, 455 U.S. 209 (1982), and United States v. Olano, 507 U.S. 725 (1993). United States v. Lawson, 677 F.3d 629, 642 (4th Cir. 2012); see also id. at 643-44 (describing the circuit split). A brief discussion of Phillips, Olano, and our subsequent case law is instructive.

Phillips was a habeas corpus appeal in which a sitting juror applied to the state district attorney's office for a position as an investigator during the pendency of a state court trial. 455 U.S. at 212. The defendant learned of the juror's employment application after the jury found him guilty. As a result, the defendant moved to set aside the verdict. Id. at 213. After conducting a hearing in which the trial court received testimony from the juror and the prosecutor, the trial court denied the defendant's motion, finding that the juror was not biased as a result of his employment application. Id. at 213-14. The Supreme Court concluded that the hearing was

sufficient, holding that due process requires the trial court to conduct a hearing during which "the defendant has the opportunity to prove actual bias." Id. at 215 (emphasis supplied). Although the Court spoke in terms of the defendant proving bias rather than the government rebutting a presumption of prejudice, we have nonetheless expressly held that Phillips did not overturn the Remmer presumption. See Stockton, 852 F.2d at 744 (distinguishing Phillips and concluding that in cases where "the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury," the Remmer presumption applies (emphasis supplied)).

Olano was a direct appeal in which a district court permitted alternate jurors to be present during jury deliberations in violation of Federal Rule of Criminal Procedure 24(c). 507 U.S. at 729-30. Because the defendants did not object to the alternate jurors' presence, the Supreme Court considered whether the district court's decision was plain error under Federal Rule of Criminal Procedure 52(b). Id. at 730, 737. The Supreme Court cited Remmer and observed, "[t]here may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" Id. at 739

27

(internal citations omitted). We have recently "conclude[d] that the Supreme Court's discussion, of the 'ultimate inquiry' to be performed in cases involving 'intrusions' into a jury's deliberations, suggests that this inquiry may be framed either as a rebuttable presumption or as a specific analysis of the intrusion's effect on the verdict." Lawson, 677 F.3d at 642 (emphasis supplied). Nonetheless, we have applied the Remmer presumption post-Olano, both on direct appeal and on § 2254 review. See id. (noting, on direct appeal, that "the Remmer rebuttable presumption remains live and well in the Fourth Circuit"); United States v. Blauvelt, 638 F.3d 281, 294-95 (4th Cir. 2011) (direct appeal); Wolfe v. Johnson, 565 F.3d 140, 160-62 (4th Cir. 2009) (28 U.S.C. § 2254 review); Fullwood, 290 F.3d at 677-78 (28 U.S.C. § 2254 review). Wolfe and Fullwood were post-AEDPA cases. Therefore, the Remmer presumption must have been clearly established in order to be relevant under AEDPA. See 28 U.S.C. § 2254(d).

Thus, by necessary implication, we have held that the Remmer presumption is clearly established federal law as defined by AEDPA even after the Supreme Court's decisions in Phillips and Olano. The State has not asked us to reconsider our position, and we will therefore continue to deem the Remmer presumption "clearly established federal law" here. See Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (per curiam)

(explaining that "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent").

b.

We also recognize that Remmer established a separate, but related requirement that a defendant be entitled to a hearing when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury. See Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1535 (4th Cir. 1986) (describing the Remmer presumption and explaining that "Remmer also established the requirement of a post-trial evidentiary hearing in which the prevailing party has the opportunity and burden of rebutting the presumption of juror prejudice"); see also United States v. Malloy, 758 F.2d 979, 982 (4th Cir. 1985) (referring to the post-trial evidentiary hearing concerning potential juror bias as a "required" hearing); Stouffer v. Trammell, 738 F.3d 1205, 1214 (10th Cir. 2013) (explaining that "[t]he trial court's duty to conduct a Remmer hearing when

29

genuine concerns of improper juror contact arise is clearly established by the Supreme Court").[12]

Post-Remmer Supreme Court case law has confirmed that due process requires a hearing to alleviate concerns of juror partiality. In Phillips, the Court explained that it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. 209, 215 (1982); see also Porter v. Illinois, 479 U.S. 898, 900 (1986) (Marshall, J., dissenting from denial of writ of certiorari) (citing Remmer and Phillips and explaining that "[w]hen a substantial question of juror bias is presented to the trial court, . . . we have held that the defendant is entitled to a hearing with all interested parties permitted to participate" (internal quotation marks omitted)).

The requirement that a trial court conduct a hearing to determine juror partiality is rooted in the Constitution:

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made

---

[12] See also United States v. Sandalis, 14 F. App'x 287, 289 (4th Cir. 2001) (unpublished per curiam) (citing Remmer and explaining that "when a party makes a threshold showing that improper external influences came to bear on the decision-making process of a juror, an evidentiary hearing on juror bias not only is allowed under Federal Rule of Evidence 606(b), but is required").

30

        at a hearing like that ordered in Remmer and held in
        this case.

Phillips, 455 U.S. at 217.    Depending on when allegations of

improper juror communication or contact are brought to the trial

court's attention, the hearing requirement may be satisfied

post-trial, like in Remmer, or during trial.    See Ladd v. South

Carolina, 415 F.2d 870, 873 (4th Cir. 1969) (explaining that by

conducting an "adversary proceeding . . . in open court during

the state trial," the trial judge did "precisely that taught by

Remmer").    Accordingly, it is clearly established federal law

for purposes of our review under AEDPA that a defendant is

entitled to a hearing when he or she presents a credible

allegation of communications or contact between a third party

and a juror concerning the matter pending before the jury.[13]

---

[13]  Whether the Remmer presumption has been altered or
diminished by Philips and Olano, as described above, does not
affect our conclusion that the Remmer hearing requirement is
clearly established federal law.   In Phillips, the Supreme Court
actually reinforced the hearing requirement as an independent
remedy, explaining that the "Court has long held that the remedy
for allegations of juror partiality is a hearing in which the
defendant has the opportunity to prove actual bias."   Id. at
215.   In Olano, because the defendants never requested a hearing
to determine whether the presence of alternate jurors during
deliberations influenced the verdict, the Supreme Court did not
need to decide "whether the courts of appeals have authority to
remand for Remmer-like hearings on plain-error review."   507
U.S. at 740.

31

Of course, not every allegation of an unauthorized communication between a juror and a third party will trigger the Remmer presumption and its corresponding hearing requirement. See Haley, 802 F.3d at 1537 n.9 (recognizing that "certain kinds of extrajudicial contacts may amount to nothing more than innocuous interventions that simply could not justify a presumption of prejudicial effect"). To be sure, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," Phillips, 455 U.S. at 217, and the Remmer presumption "is not one to be casually invoked," Stockton, 852 F.2d at 745. Therefore, to be entitled to the Remmer presumption and a Remmer hearing, a "defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." Id. at 743; Billings v. Polk, 441 F.3d 238, 247 n.6 (4th Cir. 2006); see also Stouffer, 738 F.3d at 1214 ("When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant."); Wisehart v. Davis, 408 F.3d 321, 326 (7th Cir. 2005) (a Remmer hearing is required when "the extraneous communication to the juror [is] of a character that creates a

reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury").

Stated differently, the Remmer presumption and hearing requirement are triggered after the party attacking the verdict satisfies the "minimal standard" of showing that "extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions." United States v. Cheek, 94 F.3d 136, 141 (4th Cir. 1996) (internal citations and quotation marks omitted). In considering whether a particular communication or contact between a juror and a third party is more than an innocuous intervention, we refer back to the "factors the Supreme Court deemed important" in Remmer itself. Id. Those factors are: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury. See id. (citing Remmer, 347 U.S. at 229).

Extrajudicial communications or contact with a juror has been deemed to trigger Remmer in a variety of circumstances, including: a juror being offered a bribe during trial and subsequently being investigated by an FBI agent, Remmer, 347 U.S. at 229-30; a juror applying for a job at the prosecuting attorney's office during the trial, Phillips, 455 U.S. 216-18; a local restaurant owner suggesting to jurors in a capital case

33

that "they ought to fry the son of a bitch," Stockton, 852 F.2d at 743; and allegations, if proven to be true during an evidentiary hearing, that a juror's husband pressured her throughout the trial to vote for the death penalty, Fullwood, 290 F.3d 681-82. See also Parker, 385 U.S. at 363-64 (finding habeas petitioner was deprived of his right to an impartial jury where the bailiff said, in the presence of certain jurors, that petitioner was a "wicked fellow" and that he was guilty, and later said to another juror, "[i]f there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it" (alteration in original)); Turner, 379 U.S. at 467-69, 474 (finding state defendant was denied the right to a trial by an impartial jury where two deputy sheriffs, who served as key prosecution witnesses, were responsible for the sequestration of the jury during which time they "ate with [the jury], conversed with them, and did errands for them," even where there was no evidence that the deputies discussed the case with the jurors).

Importantly, each of the illustrations above dealt with external influences on jury deliberations. See Wolfe, 565 F.3d at 161 ("In its jury influence jurisprudence, the [Supreme] Court has clearly distinguished between external jury influences, on the one hand, and internal jury influences, on the other." (emphasis in original)). As we have recognized, "[u]nder clearly established Supreme Court case law," an

34

influence on a jury's deliberative process is external if it is either "extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case," or if it is "an outside influence upon the partiality of the jury, such as private communication, contact, or tampering . . . with a juror." Robinson, 438 F.3d at 363 (internal citations and quotation marks omitted). The distinction between internal and external jury influences is critical because, unlike external influences, which "necessitate a thorough judicial inquiry, no such obligation is imposed with regard to an internal jury influence." Wolfe, 565 F.3d at 161 (emphasis supplied); see also Robinson (explaining that Tanner v. United States, 438 U.S. 107 (1987) "establishes that the Sixth Amendment's guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process").

3.

In the face of this clearly established Supreme Court precedent available to guide a state court's adjudication of a claim of external influences on a jury's deliberations, the State nonetheless asserts that because the Supreme Court's decisions evaluating external influences on a jury's deliberations involved different factual circumstances than those presented by Barnes, the Supreme Court "has given state

35

courts little to no guidance" in adjudicating such claims. Appellee Br. 21-22. It is, therefore, the State's position that the MAR Court's adjudication in this case could not have been an unreasonable application of clearly established federal law. The State is incorrect.

Indeed, Remmer and its progeny clearly established that a presumption of prejudice must be applied, and that a hearing must be held, when a defendant presents a genuine allegation of communication or contact between a third party and a juror concerning the matter pending before the jury. There is no requirement under AEDPA that a habeas petitioner present facts identical to those previously considered by the Supreme Court to be entitled to relief. Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (noting that "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied'" (quoting Carey v. Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment))); see also Williams v. Taylor, 529 U.S. 362, 407 (2000) (a state court's decision is an "unreasonable application" of clearly established federal law if the court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" (emphasis supplied)). Thus, as illustrated, this clearly established legal principle can

36

apply to myriad factual circumstances involving third party communications with jurors.

Our § 2254 review of Barnes' juror misconduct claim is therefore guided by Remmer and the other clearly established Supreme Court precedent described above concerning third party communications with jurors.

## B.

### Unreasonable Application of Clearly Established Federal Law

Having identified the clearly established federal law governing Barnes' juror misconduct claim, we must now determine whether the MAR Court acted contrary to this clearly established law, or applied it unreasonably, in failing to order a hearing and failing to apply a presumption of prejudice after Barnes presented allegations that a juror communicated with her pastor about the death penalty during Barnes' capital sentencing. In view of the evidence presented to the MAR Court, we conclude that its adjudication of Barnes' juror misconduct claim amounted to an unreasonable application of clearly established federal law.

### 1.

Immediately after the jury recommended that Barnes be sentenced to death, the trial court was alerted to the fact that one of the jurors "called a member of the clergy, perhaps a relative of hers, to ask about a particular question as to the

37

death penalty." J.A. 1602. In response to the trial judge's inquiry regarding whether the juror "discussed the particular facts of this case with anybody outside the jury," defense counsel stated that there was "[n]o evidence that they did or did not as far as the conversation with the minister is concerned." Id. Because defense counsel could not point to any such evidence at that time, the trial court "den[ied] the request to start questioning [the] jury about what may or may not have taken place during their deliberations of this trial." Id. at 1602-03.

Barnes provided additional details concerning the juror's communication with her pastor to the MAR Court. In his MAR, Barnes presented allegations that one or more jurors were bothered by a closing argument made during Barnes' capital sentencing hearing. The closing argument in question was made by a co-defendant's attorney, in which he suggested that if the jury returned a sentence of death, the jurors would one day face God's judgment for their actions. According to Juror Peacock, the closing argument "made the jury furious." J.A. 1900. Moreover, Juror Jordan noticed "that another juror, a female, seemed visibly upset by the argument." Id. at 1898. In response, Juror Jordan contacted her pastor, Pastor Lomax, and "discussed the lawyer's argument" with him. Id. at 1892. During their conversation, Pastor Lomax "told [Juror] Jordan

38

about another biblical passage which contradicted the passage relied upon by the defense attorney." Id. Two other jurors remembered that a juror talked to her pastor during the case. In particular, Juror Weddington stated that "a juror named 'Hollie' brought a Bible into the jury room and read from it" and that "Hollie also talked to her pastor during the case." Id. at 1902. Additionally, Juror Allen "recalled discussions about the fact that one of the jurors had brought in a [B]ible and had talked with her pastor." Id.[14]

Barnes presented further evidence to the MAR Court that Juror Jordan brought her Bible into the jury deliberation room and "read the passage suggested to her by [Pastor] Lomax to all of the jurors." J.A. 1892. Although Juror Jordan recalled that the passage stated "that it [was] the duty of Christians to abide by the laws of the state," id. at 1898, Juror Peacock stated that the passage "dealt with life and death," id. at 1893. In addition, Juror Weddington observed, "[t]he person who brought in the Bible read a passage to a juror who was having a hard time with the death penalty." Id. at 1892-93.

---

[14] For his part, Pastor Lomax "could not recall the conversation recounted by [Juror] Jordan." J.A. 1893. He stated, however, "that it [was] possible that he did talk to [Juror Jordan] about the death penalty while she was a juror, but he simply does not remember it." Id.

2.

After being presented with the allegations described above, the MAR Court failed to apply Remmer or any reasonable version of it. As we have explained, Remmer imposes not only a presumption of prejudice, but also entitles the defendant to an evidentiary hearing when the defendant presents allegations of an extraneous influence on the jury -- that is, communications or contact between a third party and a juror concerning the matter pending before the jury. Remmer, 347 U.S. at 229-30; Haley, 802 F.2d at 1535. Here, it is without question that Juror Jordan's conversation with Pastor Lomax was a contact or communication with a third party. We must therefore determine whether this contact concerned the matter pending before the jury.

An unauthorized contact between a third party and a juror concerns the matter pending before the jury when it is "of such a character as to reasonably draw into question the integrity of the verdict." Stockton, 852 F.2d at 743.[15] This is

---

[15] As we have previously noted, Stockton was a 28 U.S.C. § 2254 case in which we applied Remmer. See Fullwood, 290 F.3d at 678. There, we explained that "when a habeas petitioner bases a juror bias claim on improper communication between, or improper influence exerted by, a nonjuror upon a juror, . . . he 'must . . . establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." Id. (quoting Stockton, 852 F.2d at 743).

40

a "minimal standard." Cheek, 94 F.3d at 141. Indeed, all that is required is a threshold showing that "the extrajudicial communications or contacts were more than innocuous interventions." Id. (internal quotation marks omitted).

The MAR Court greatly distorted Barnes' burden, requiring much more of Barnes than a threshold or minimal showing of potential juror bias. Instead, to demonstrate an entitlement to a hearing, the MAR Court required Barnes to present evidence that a juror was actually biased and that Barnes was therefore actually prejudiced by the unauthorized communication. After concluding that Barnes' new evidence "adds nothing to the issue as it was presented during [his] original appeal," J.A. 1883, the MAR Court incorporated the North Carolina Supreme Court's reasoning from the direct appeal, which denied Barnes' request for a hearing because "[t]here is no evidence that the content of any such possible discussion prejudiced [Barnes]," State v. Barnes, 481 S.E.2d 44, 68 (N.C. 1997) (emphasis supplied). Even though Barnes alleged that Juror Jordan called Pastor Lomax and discussed the death penalty with him while Juror Jordan was considering whether Barnes and his co-defendants would live or die, the court did not consider this conversation as involving "'extraneous information' . . . or deal[ing] with the fairness and impartiality of the juror." Id. In essence, the MAR Court demanded proof of a Sixth

41

Amendment violation -- that is, proof of juror bias -- before Barnes was entitled to any relief. Such a requirement is directly at odds with Remmer. Certainly, if defendants were required to prove juror bias before obtaining a hearing, the Remmer hearing requirement, which is designed to determine "what actually transpired, or whether the incidents that may have occurred were harmful or harmless," Remmer, 347 U.S. at 229, would be utterly meaningless. Therefore, no reasonable reading of Remmer comports with the burden placed on Barnes by the MAR Court.

The district court's conclusion that Juror Jordon's conversation with Pastor Lomax did not reasonably draw into question the integrity of the verdict is similarly flawed. In the district court's view, Barnes' allegations simply demonstrated that Pastor Lomax directed Juror Jordan "to a portion of the Bible in response to a defense argument that was most assuredly not before the jury -- i.e., whether God would condemn a juror who voted to impose a death sentence." Barnes v. Lassiter, 1:08-CV-00271, 2013 WL 1314466, at *6 (M.D.N.C. Mar. 28, 2013) (emphasis in original). We cannot agree. During the sentencing phase of Barnes' trial, the jury was charged with deciding whether to impose a sentence of life imprisonment or a sentence of death for Barnes and his co-defendants. Clearly, then, "the matter before the jury" was the appropriateness of

42

the death penalty for these defendants. To the extent that a juror had a conversation with a third party about the spiritual or moral implications of making this decision, the communication "was of such a character as to reasonably draw into question the integrity of the verdict," Stockton, 852 F.2d at 743, and further inquiry in a Remmer hearing was required.

Our dissenting colleague characterizes this analysis as "conclud[ing] that the communication alleged here satisfies Remmer because 'the spiritual or moral implications of' deciding whether to impose death 'clearly' related to 'the matter pending before the jury.'" Post at 72. The dissenting opinion misconstrues the point. Given a jury's role during the sentencing phase of a capital case, "the matter pending before the jury" is to determine whether or not the defendant ought to receive the death penalty. See Caldwell v. Mississippi, 472 U.S. 320, 329 (1985) (describing the duty of "capital sentencers" as "the serious one of determining whether a specific human being should die at the hands of the State"); Stockton, 852 F.2d at 746 (28 U.S.C. § 2254 case analyzing Remmer and noting that "the exact issue" for jurors in the sentencing phase of a capital case to decide is "whether to impose the death penalty"). Here, as the dissent acknowledges, during the sentencing phase, the jury was presented with an argument from defense counsel "suggest[ing] that if jurors

43

returned a death sentence, they, the jurors would one day face judgment for their actions." J.A. 1892 (emphasis supplied). This argument was directly aimed at whether the jury should impose the death penalty, and at no point did the trial court instruct the jury to disregard the argument. The argument was thus squarely presented for the jury's consideration as part of their ultimate sentencing decision.

After hearing the argument, Juror Jordan contacted her pastor and "discussed the lawyer's argument" with him. J.A. 1892. During their conversation, the pastor "told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney." Id. We need look no further than these allegations to conclude that Juror Jordan's conversation with a third party about defense counsel's argument, which asked the jury to return a sentence of life imprisonment instead of death, bore on the jury's sentencing determination and was, therefore, "about the matter pending before the jury." To conclude otherwise would not simply be incorrect or erroneous; it would be objectively unreasonable.[16]

---

[16] The dissent suggests that "it would not be 'objectively unreasonable' for the state court to limit the scope of 'the matter pending before the jury' to communication or contact suggesting how the juror should vote in a particular case." Post at 73. In the dissent's view, "[t]he North Carolina state MAR [C]ourt could reasonably conclude that the type of communication at issue here did not constitute contact 'about (Continued)

44

Moreover, in discussing whether relief under Remmer was warranted in this case, the dissent focuses not on what is alleged by Barnes, but rather on what is missing from his allegations. In this regard, the dissent states, "[n]owhere in the affidavits supporting his claim does Barnes suggest that the pastor expressed his views of the death penalty either generally or as applied to this case." Post at 75. The dissent continues, noting that Barnes' affidavits do not "support the claim that the pastor attempted to persuade the juror to vote for or against the death penalty, suggested that the Bible supported a particular sentence in this case, or exposed the juror to any extraneous information relevant to the juror's

_____

the matter pending before the jury' because it was not directed to the choice of sentence, life in prison or death, that the jury was ultimately charged to determine." Id. at 77-78. We could not disagree more. Indeed, Barnes' allegations satisfy even this arguably more stringent standard offered by the dissent. The alleged conversation at issue here was prompted by a defense argument concerning the consequences for a juror who votes to impose a death sentence for Barnes and his co-defendants. Juror Jordan and Pastor Lomax "discussed the [defense] lawyer's argument," and Pastor Lomax "told [Juror] Jordan about another biblical passage which contradicted the passage relied upon by the defense attorney." J.A. 1892. Thus, Pastor Lomax's communication bore directly on the very decision facing Juror Jordan -- whether to impose the death penalty. Even under the dissent's proposed iteration of the relevant standard, it is hard to see how this communication does not "suggest[] how the juror should vote in a particular case," see post at 73, or how the communication "was not directed to the choice of sentence, life in prison or death," see post at 77.

45

deliberative process." Id. In making these observations, the dissent ignores a critical component underlying the Supreme Court's concern in cases involving juror bias -- that without a hearing, a criminal defendant is deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation. See Remmer, 347 U.S. at 229 ("We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless."); Remmer II, 350 U.S. at 379-80 ("It was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing."); Smith, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").

The Supreme Court has cautioned, "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions." Remmer, 347 U.S. at 229. Here, Barnes has sufficiently alleged a third party communication with a juror that may well have jeopardized the integrity of the sentencing phase of his trial. The absence of evidence highlighted by the dissent, coupled with the nature of Barnes' allegations, is

precisely why Remmer requires the state courts to hold a hearing in such cases.

The district court concluded, however, that a hearing in state court was not necessary because the "North Carolina courts accepted . . . Barnes' claims as true when they assessed whether he had raised a constitutional claim warranting relief and determined that he had not." Barnes, 2013 WL 1314466, at *6. But, when a court is presented with credible allegations of juror communications with a third party about the matter pending before the jury, Remmer requires a hearing. This requirement cannot be circumvented by simply accepting the factual allegations as true. Just as in Remmer, the MAR Court here, faced with a credible claim of juror misconduct, "[did] not know from this record, nor [did] [Barnes] know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless." Remmer, 347 U.S. at 229. Accordingly, the district court incorrectly concluded that although there was unauthorized contact between a juror and her pastor, Barnes was not entitled to the Remmer presumption of prejudice or a Remmer hearing.

Barnes' allegations raised a genuine concern of juror impartiality, and due process therefore required the MAR Court to remedy this allegation by ordering a hearing in which Barnes would have enjoyed a presumption of prejudice. See Phillips,

47

455 U.S. at 215; Haley, 802 F.2d at 1535. By demanding that Barnes prove prejudice before affording him a hearing, the MAR Court turned Remmer on its head. The MAR Court's adjudication was an objectively unreasonable application of clearly established federal law to the facts of Barnes' juror misconduct claim, see Williams, 529 U.S. at 407, and its failure to investigate Barnes' juror misconduct claim was thus an abuse of discretion.

3.

The State nevertheless argues that the MAR Court did not unreasonably apply clearly established federal law because our court has previously determined, on § 2254 review, that it was not unreasonable for a state court to conclude that the presence of a Bible in the jury room was not an extraneous prejudicial influence on a jury's verdict. Our "Bible in the jury room" line of cases, however, is readily distinguishable. In Robinson, for example, a juror asked the bailiff for a Bible and subsequently read several passages out loud in the jury room -- including at least one referring to "an eye for an eye" -- to convince the other jurors to vote for a death sentence. 438 F.3d at 357-58. With respect to the Remmer issue, we held, "it would have been reasonable for the MAR court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror." Id. at 363. Unlike a private

48

communication with a third party, "which impose[s] pressure upon a juror apart from the juror himself, the reading of Bible passages invites the listener to examine his or her own conscience from within." Id. Therefore, we concluded that the Bible, standing alone, was not an "external influence," as that term was used in the Remmer line of cases. Id. at 363-64. Of particular relevance here, we further explained:

> The fact that the bailiff provided the Bible to the juror does not alter our conclusion that it was not an external influence. Robinson does not allege that the bailiff instructed the jury to consult the Bible, or, for that matter, that he did anything other than simply provide the Bible upon the juror's request. On these facts, the MAR court reasonably could have concluded that the bailiff's act of providing a Bible was nothing more than an innocuous intervention into the jury's deliberations.

Id. at 366.

Despite the State's arguments to the contrary, the only similarity between the instant case and the "Bible in the jury room" line of cases is the Bible itself. Unlike in Robinson, where the juror in question was simply given a Bible and read from it in the jury room, Barnes has alleged that Juror Jordan was actually directed to a specific biblical passage by her pastor in response to an argument about the death penalty and that other jurors were aware that Juror Jordan had consulted her pastor in this regard. We alluded that Robinson might have been a different case if the bailiff had "instructed the jury to

49

consult the Bible" or done "anything other than simply provide the Bible upon the juror's request."  438 F.3d at 366.  Barnes has presented that case -- his allegations clearly indicate that Pastor Lomax did not simply provide Juror Jordan with a Bible. In sum, because Robinson did not involve any extraneous communication or contact between a juror and a third party, it does not change our conclusion that the MAR Court unreasonably applied clearly established federal law by simply denying Barnes' juror misconduct claim without applying a presumption of prejudice and ordering a Remmer hearing.

## C.

### Substantial and Injurious Effect or Influence

Despite our conclusion that the MAR Court's adjudication of Barnes' juror misconduct claim was an unreasonable application of clearly established federal law, "we are not permitted to grant habeas relief unless we are convinced that the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  Fullwood, 290 F.3d at 679 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  This means that before we can grant habeas relief, we must conclude that the MAR Court's error "actually prejudiced" Barnes.  Bauberger, 632 F.3d at 104.  "If we are in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail."  Fullwood, 290 F.3d at 679 (citing O'Neal v.

50

McAninch, 513 U.S. 432, 436 (1995)).  "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipose' regarding the error's harmlessness."  Id.

In the district court's assessment, Barnes' allegations failed to demonstrate that Juror Jordan's contact with Pastor Lomax had a substantial and injurious effect or influence on the jury's verdict.  This conclusion, however, was based on the district court's erroneous holding that the MAR Court did not unreasonably apply clearly established federal law in denying Barnes a presumption of prejudice and a Remmer hearing.  Moreover, given the state court's complete failure to investigate Barnes' juror misconduct claim, the district court had no basis from which to determine whether Juror Jordan's communication with her pastor was harmless.

Based on the record before us, it is unclear whether Barnes can demonstrate actual prejudice or whether the MAR Court's unreasonable application of federal law was harmless.  See Fullwood, 290 F.3d at 682 ("Given the paucity of the record and the lack of any factual findings, . . . we are unable to determine whether an outside influence upon [the juror] had a 'substantial and injurious effect or influence in determining the jury's verdict.'" (quoting Brecht, 507 U.S. at 637)).  What is clear, however, is that Barnes must be given the opportunity

51

to prove actual prejudice. Accordingly, we will remand for the district court to conduct an evidentiary hearing solely on the issue of whether the state court's failure to apply the Remmer presumption and failure to investigate Juror Jordan's contact with Pastor Lomax had a substantial and injurious effect or influence on the jury's verdict. See id.; Hall, 692 F.3d at 807 (explaining that the court is "uncertain as to whether [the habeas petitioner] was actually prejudiced by the state courts' constitutional error, given the dearth of information before [the court]" and remanding for a hearing on actual prejudice).

As the Seventh Circuit has recently explained, "[t]he Remmer presumption is meant to protect against the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court's failure to apply the presumption only results in actual prejudice if the jury's verdict was tainted by such information." Hall, 692 F.3d at 805. Barnes will not be entitled to the Remmer presumption in attempting to make this showing because the presumption does not apply in the federal habeas context when proving a substantial and injurious effect or influence on the jury's verdict. See Lawson, 677 F.3d at 644 (citing Vigil v. Zavaras, 298 F.3d 935, 941 n.6 (10th Cir. 2002)). Therefore, to be entitled to habeas relief, Barnes will need to affirmatively prove actual prejudice by demonstrating

that the jury's verdict was tainted by the extraneous communication between Juror Jordan and Pastor Lomax.

IV.

Pursuant to the foregoing, the judgment of the district court is reversed, and this matter is remanded to the district court for an evidentiary hearing to determine whether the state court's failure to apply the Remmer presumption and its failure to investigate Barnes' allegations of juror misconduct in a hearing had a substantial and injurious effect or influence on the jury's verdict.

REVERSED AND REMANDED

AGEE, Circuit Judge, dissenting:

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits when a federal court may grant habeas relief to a state prisoner. 28 U.S.C. § 2254(d). The majority agrees with Barnes that the North Carolina state courts' adjudication of his claim satisfies AEDPA's requirements because it unreasonably applied Remmer v. United States, 347 U.S. 227 (1954). I disagree, and therefore respectfully dissent.

I.

AEDPA—which requires federal courts to give deference to state court adjudications in close cases involving uncertain Supreme Court precedent—dictates the proper outcome in this case. See Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."). Under AEDPA, a federal court "shall not" grant habeas relief "to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1).[1]  The majority opinion acknowledges AEDPA's constraints only in the abstract, while simultaneously analyzing the case at bar as if it were on direct appeal from the trial. Thus, the majority opinion engages in a first-impression analysis that substitutes "its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," a result AEDPA does not permit.  See Williams v. Taylor, 529 U.S. 362, 411 (2000). Given the centrality of appellate application of AEDPA deference, I begin by reviewing its demands on federal courts examining state court decisions.

A.

Recent Supreme Court opinions addressing § 2254 unfailingly and repeatedly impress upon circuit courts of appeals "the substantial deference that AEDPA requires" federal courts to give to state court adjudications of state prisoner claims. White v. Woodall, --- U.S. ---, No. 12-794, 2014 WL 1612424, at *2 (observing that § 2254(d)'s limitations are "a provision of law that some federal judges find too confining, but that all federal judges must obey"); Nevada v. Jackson, 133 S. Ct. 1990,

---

[1]  Barnes relies on the "unreasonable application of" component of § 2254(d)(1) rather than the "contrary to" component.

1994 (2013) (per curiam); Burt v. Titlow, 134 S. Ct. 10, 16 (2013) ("AEDPA erects a formidable barrier to federal habeas relief for [state] prisoners."); Greene v. Fisher, 132 S. Ct. 38, 43 (2011) (observing that AEDPA's standard is "difficult to meet, because [its purpose] is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction" (internal quotation marks omitted)); Harrington v. Richter, 131 S. Ct. 770, 785 (2011) ("A state court must be granted a deference and latitude that are not in operation when the case involves review under" direct review.); Renico v. Lett, 559 U.S. 766, 773 (2010) (explaining that AEDPA "'demands that state-court decisions be given the benefit of the doubt'" (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). The Supreme Court has also warned against "collapsing the distinction between 'an unreasonable application of federal law' and . . . 'an incorrect or erroneous application of federal law." Jackson, 133 S. Ct. at 1994 (quoting Williams, 529 U.S. at 412).

A state court's decision is an "unreasonable application of" Supreme Court case law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529

U.S. at 407-08.[2]  Limiting the "unreasonable application" prong further, the Supreme Court recently rejected the Fourth Circuit's additional characterization that a state court could unreasonably apply Supreme Court precedent by "unreasonabl[y] refus[ing] to extend a legal principle to a new legal context where it should apply."  White, 2014 WL 1612424, at *8 ("To the extent the unreasonable-refusal-to-extend rule differs from the one embraced in Williams and reiterated many times since, we reject it.  Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").  Moreover, where the Supreme Court has articulated a broader governing principle, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" than where the Court has articulated a narrower rule.  Harrington, 131 S. Ct. at 786 (internal alteration and quotation marks omitted).

---

[2]  As the majority opinion notes, a state court's adjudication on the merits "need not cite or even be aware of [Supreme Court] cases" or explain its rationale for this Court to be owed deference under § 2254(d).  Harrington, 131 S. Ct. at 784.  Even where the state court's decision does not explain its reasoning or does so broadly, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Id.

AEDPA deference to state court decisions means that "a federal habeas court may overturn a state court's application of clearly established federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" Jackson, 133 S. Ct. at 1992 (quoting Harrington, 131 S. Ct. at 786); see also White, 2014 WL 1612424, at *8 ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."). And in undertaking its review, a federal court is not constrained by the state court's express reasoning, but instead "must determine what arguments or theories supported or, as here, could have supported, the state court's decision." Harrington, 131 S. Ct. at 786. Although the majority opinion fleetingly purports to apply AEDPA deference, it in truth simply disagrees with an interpretation of Remmer that would allow the state court to conclude that the conversation alleged to have occurred here was not about a "matter pending before the jury." Cf. Maj. Op. at 42. In doing so, the majority opinion "disregards perfectly reasonable interpretations [of Supreme Court precedent] and hence contravenes § 2254(d)'s deferential standard of review." See White, 2014 WL 1612424, at *6.

58

Through the applicable AEDPA lens, then, I consider the North Carolina courts' decisions denying Barnes a presumption of prejudice or an evidentiary hearing in light of his allegation that a juror communicated with her pastor during sentencing deliberations. This inquiry entails examining the context and nature of Barnes' allegations as well as the applicable Supreme Court precedent.

During closing arguments for the sentencing phase of Barnes and his co-defendants' trial, one co-defendant's attorney told any "true believers" on the jury that "all of us will stand in judgment [before God] one day." The attorney urged the jurors to consider their judgment day before God and whether God would praise them for not violating His commands—including "Thou shalt not kill"—even if the state authorized sentencing a person to death. (J.A. 1532-33.) The defense argument about the eternal consequences to the jury's decision left several jurors visibly affected and, in one juror's words, "furious." (J.A. 1900.) For reasons unexplained in the record and only speculated to during oral argument, the prosecution did not object to this argument.

Following the jury's deliberations and recommendation that Barnes be sentenced to death, Barnes' attorney informed the trial court that he had been apprised that one juror had spoken

to "a member of the clergy" during the trial "about a particular question as to the death penalty." (J.A. 1602.)  Because Barnes had no evidence that the juror discussed "the particular facts of this case with anybody outside the jury," the trial court did not allow the jurors to be questioned about this incident and denied Barnes' motion for a new trial.  (J.A. 1602-03.)

Barnes argued on direct appeal that the trial court abused its discretion by denying his motion and not investigating this allegation of juror misconduct.  The North Carolina Supreme Court assumed that Barnes' allegations regarding third-party contact were true, but concluded that the trial court had not abused its discretion when confronted by a "mere unsubstantiated allegation" that did not call into question "the fairness or impartiality of the juror."  (J.A. 1854-55.)  In particular, the North Carolina Supreme Court noted the absence of evidence that the communication "prejudiced [Barnes] or that the juror gained access to improper or prejudicial matters and considered them with regard to this case."  (J.A. 1855.)

When filing his North Carolina Motion for Appropriate Relief ("MAR"), Barnes attached several affidavits and an interview summary purporting to support his claim of "juror misconduct and extraneous influences on the jury."  (J.A. 1882.)  An affidavit from Barnes' private investigator averred that juror Hollie Jordan told him she believed that the co-

60

defendant's attorney had "quot[ed] scripture out of context" when he asserted "the jurors would one day face judgment for their actions" if they sentenced the defendants to death. She "called her pastor" and "discussed the lawyer's argument with" him, during which time the pastor informed her of "another biblical passage which contradicted the passage relied upon by the defense attorney." (J.A. 1892.) On the day of her interview with the private investigator, Ms. Jordan signed an interview summary that does not mention any conversation with her pastor. Instead, Ms. Jordan's signed statement says that she was troubled by the co-defendant's attorney's argument, and that she "brought a Bible from home into the jury deliberation[,] she read an unspecified passage from the Bible stating that it is the duty of Christians to abide by the laws of the state[, and that she] knew the passage from church." (J.A. 1898.)[3]

Several other jurors recalled that one or more jurors read from the Bible during the course of the jury's deliberations. None of the jurors could remember the verses read, but some of them recalled that they at least in part related to the co-defendant's attorney's troubling closing argument, and "dealt

_____

[3] Juror Jordan's pastor did not recall conversing with Ms. Jordan, but admitted it was possible that he had done so and "simply [did] not remember it." (J.A. 1893.)

with life and death." A few jurors also recalled that a juror had talked to her pastor during the proceedings. (J.A. 1892-93, 1900, 1902-03.)

The North Carolina MAR court denied Barnes' claims as "procedurally barred and without merit," explaining that the evidence acquired after the direct appeal did not alter the nature of Barnes' claims, which were "subject to the same analysis inherent in the [North Carolina Supreme Court's] decision." (J.A. 1883.)

Barnes thereafter timely filed a § 2254 petition for a writ of habeas corpus in the U.S. District Court for the Middle District of North Carolina. Relevant to this appeal, Barnes once again alleged that juror misconduct during the sentencing deliberations violated his due process rights. Specifically, he asserted that a juror improperly asked her pastor for advice "about the biblical correctness of a defense closing argument" (J.A. 1631), that the juror then improperly tainted the jury deliberation by reading Bible verses to other jurors, and that the state court erred by not granting Barnes a presumption of prejudice or conducting an evidentiary hearing to establish the prejudicial effect of these incidents. (J.A. 1627-40.) The district court denied Barnes' petition, but granted a certificate of appealability "with respect to the issue whether a juror's contact with her pastor violated [his] Sixth Amendment

right to a fair trial." (J.A. 2181.)[4]

## C.

Barnes alleges, as he did below, that the state courts unreasonably applied Supreme Court precedent by denying him a presumption of prejudice arising from the juror's conversation with her pastor. He asserts that this conversation "constituted an impermissible external influence on the deliberating jury," which entitles him to a new sentencing hearing. (Opening Br. 18.) In the alternative, he asserts that the state courts unreasonably applied Supreme Court precedent by denying him the opportunity to prove actual prejudice at an evidentiary hearing.

The Sixth Amendment's due process right to a jury trial encompasses being tried "by a panel of impartial, indifferent jurors." Turner v. Louisiana, 379 U.S. 466, 471 (1965) (internal quotation marks omitted). And "[t]he failure to

---

[4] Barnes continues to press the impropriety of reading the Bible during deliberations inasmuch as he alleges that the juror communicated information originally given to her from her pastor to the jury. To the extent that reading the Bible during deliberations would present a separate claim of juror misconduct, that claim is not properly before this Court. Moreover, the analysis for the juror contact claim turns on the conversation alleged to have occurred between the juror and her pastor, not on what the juror did thereafter. If that communication did not trigger Remmer, then nothing the juror did thereafter would present a different claim than the separate, "reading the Bible during deliberations" claim for which Barnes has not been issued a COA.

accord an accused a fair hearing violates even the minimal standards of due process." Id. at 471-72. This constitutional concern forms the basis for a limited exception to "the near-universal and firmly established common-law rule in the United States [that] flatly prohibit[s] the admission of juror testimony to impeach a jury verdict." Tanner v. United States, 483 U.S. 107, 117 (1987). The exception permits juror testimony regarding "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Id. at 121 (quoting Federal Rule of Evidence 606(b)).[5]

Barnes' allegations fall within two overlapping sets of Supreme Court cases related to this narrow exception: those dealing with third-party contact during a trial and those dealing with juror misconduct during a trial. See Smith v. Phillips, 455 U.S. 209, 221-22 (1984) (O'Connor, J., concurring).[6] That said, the Supreme Court has considered claims

---

[5] North Carolina Rule of Evidence 606(b) mirrors the federal exception. See N.C. Gen. Stat. § 8C-1, Rule 606(b).

[6] Allegations of juror misconduct are further broken down into those alleging extraneous juror misconduct and those alleging internal juror misconduct. Although the line between these two types of misconduct is not always clear, the distinction creates important consequences when analyzing a petitioner's claim in light of the applicable evidentiary rules. See Tanner, 483 U.S. at 116-22 (discussing the common law rule adopted in federal court prohibiting juror testimony on matters (Continued)

based on jury bias arising from third-party contact during the course of a trial in only a handful of cases.

The cornerstone of Barnes' argument rests on <u>Remmer</u>, in which the Supreme Court considered what due process required when Remmer alleged an improper external influence on a juror arising from a third-party telling the juror he "could profit by bringing in a verdict favorable to" one party. 347 U.S. at 228. The juror told the trial court about this contact, and the trial court reported the contact to the Federal Bureau of Investigation, which investigated the matter further. <u>Id.</u> Remmer moved for a new trial, alleging that this external contact with the juror deprived him of a fair trial. <u>Id.</u> at 229. The district court denied the motion without holding a hearing (which Remmer had requested) to examine the interaction and its effect. <u>Id.</u> The Supreme Court remanded the case for an evidentiary hearing, stating:

> In a criminal case, any private communication,

---

affecting the jury's deliberation, and the narrow exception to that rule permitting juror testimony in situations in which an "extraneous influence" is alleged to have affected the jury).
    Because Barnes' claim is now limited to the juror's conversation with her pastor—as opposed to a juror reading the Bible during deliberations—the analysis focuses on precedent relating to extraneous juror misconduct. <u>Cf.</u> <u>Robinson v. Polk</u>, 438 F.3d 350, 359-68 (4th Cir. 2006) (discussing this distinction in juror misconduct jurisprudence in the context of juror's use of the Bible during deliberations).

> contact, or tampering, directly or indirectly with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Id. The Supreme Court observed that the record before it did not reflect "what actually transpired, or whether the incidents that may have occurred were harmful or harmless," so a hearing was necessary. Id. It vacated the lower court's judgment and remanded the case to the district court for a hearing. Id. at 230.

In Parker v. Gladden, 385 U.S. 363 (1966) (per curiam), the Supreme Court held that a defendant was entitled to a new trial because a bailiff had stated to or in the presence of one or more jurors that the defendant was a "wicked fellow" and "guilty," and that "[i]f there [was] anything wrong [in convicting him,] the Supreme Court [would] correct it." Id. at 363-64. The Supreme Court observed that this communication implicated the defendant's constitutional rights to be tried by an impartial jury and to confront the witnesses against him. Id. at 364. And it concluded that the communication was prejudicial because the bailiff was an officer of the court and the state, had "shepherd[ed] [the jury] for eight days and

66

nights," and made statements "involv[ing] such a probability that prejudice will result that it is deemed inherently lacking in due process." Id. at 365.

In Turner v. Louisiana, 379 U.S. 466 (1965), the Supreme Court considered a different type of third-party influence on the jury's deliberation: two deputy sheriffs were both "principal witnesses for the prosecution" at the trial and charged with keeping the jury sequestered. Id. at 467-68. The court explained that the latter "meant that the jurors were continuously in the company of [these witnesses and other sheriff deputies] during the three days that the trial lasted. [They] drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." Id. at 468. Although the evidence did not indicate that the deputies discussed the case with the jurors while discharging these duties, id. at 469, 473, the Supreme Court nonetheless held that this interaction unconstitutionally tainted the proceedings. Id. at 472-73. The Court explained:

> even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial—an association which gave these

67

> witnesses an opportunity . . . to renew old friendships and make new acquaintances among the members of the jury.

Id. at 473.

Most recently, in Smith v. Phillips, 455 U.S. 209 (1984), the Supreme Court rejected a petitioner's argument that he was entitled to a new trial after a juror submitted an employment application to the prosecutor's office during the course of the trial. The Court noted that in Remmer, the "attempted bribe, which [was] 'presumptively prejudicial,' [coupled with] the undisclosed investigation, which was 'bound to impress the juror" required a hearing at which the parties could determine the prejudicial impact of these events. Id. at 215-16. However, the Court observed that "shield[ing] jurors from every contact or influence that might theoretically affect their vote," was "virtually impossible," and held that a new trial was unnecessary each time such an allegation or incident occurred. Id. at 217. Instead, the Supreme Court reiterated that a hearing—such as the one the trial court held in that case—could ensure the jury decided the case based "solely on the evidence before it" and did not prejudice the defendant. Id.

While Barnes' argument regarding "clearly established Supreme Court" case law rests on Remmer, each of the above Supreme Court cases informs how that precedent has been applied and how a court should assess allegations of juror misconduct or

third-party influence during a trial.  I agree with the majority that _Remmer_ is clearly established Supreme Court precedent, but after reviewing Barnes' claims under the AEDPA standards of review, I conclude that the North Carolina state courts did not unreasonably apply _Remmer_.

## D.

Analyzing _Remmer_'s applicability to the case at bar requires first looking to what the Supreme Court set forth as the component parts of its rule, that being:  "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptive prejudicial" except under circumstances not relevant here.  347 U.S. at 229 (emphasis added).  Read in the context of the Supreme Court's actual holding, _Remmer_'s broad reference to "_any_ private communication, contact, or tampering" is immediately constricted by the narrowing clause "about the matter pending before the jury."  This limitation makes sense given that the _Remmer_ presumption flows from the narrow exception to the common law prohibition—now expressed in the rules of evidence—against soliciting juror testimony to impeach

69

the verdict.[7]  See Robinson, 438 F.3d at 359-61 (discussing these principles); Stockton v. Virginia, 852 F.2d 740, 743-44 (4th Cir. 1988) (same).  Whatever Remmer's scope, then, it must be understood as part of a limited exception to the normal rules governing the finality of the verdict and prohibiting courts from entertaining post-judgment evidence to impeach the jury's verdict.

As the majority opinion correctly recognizes, not every third-party contact implicates Remmer's presumption of prejudice.  Supra Maj. Op. at 32-35.  See, e.g., United States v. Blauvelt, 638 F.3d 281, 294-95 (4th Cir. 2011) (holding, on direct review, that third-party contact between a juror and prosecutor unaffiliated with the case during the course of the trial was "inadvertent and innocuous" and thus did not trigger Remmer's presumption even though the juror mentioned her jury

---

[7] Federal Rule of Evidence 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

There are three exceptions, permitting jurors to testify about whether "extraneous prejudicial information was improperly brought to the jury's attention"; "an outside influence was improperly brought to bear on any juror"; or "a mistake was made in entering the verdict on the verdict form."

70

service and expressed new-found respect for the prosecutor's job); Wolfe v. Johnson, 565 F.3d 140, 162 (4th Cir. 2009) (holding, in § 2254(d) context, that the state court did not unreasonably apply Remmer in concluding Wolfe failed to show that a juror's numerous telephone conversations during the course of jury deliberations constituted an impermissible external jury influence). In applying Remmer in previous cases, this Court has held that in order to trigger Remmer's presumption, "a § 2254 petitioner must show both that an 'unauthorized contact was made and that it was of such a character as reasonably to draw into question the integrity of the verdict.'" Wolfe, 565 F.3d at 162 (internal quotation marks omitted) (emphasis added).

Significantly, neither Remmer nor any subsequent Supreme Court case has elaborated on when interaction between a juror and third party is "about the matter pending before the jury." An area undefined by the Supreme Court thus exists between the general principle espoused in Remmer and acceptable interpretations—including limitations—of it. Rather than calling those parameters into question in the first instance, under AEDPA, the Court may only grant relief if the state courts' conclusion that Barnes' allegations fell outside Remmer's scope was "unreasonable." And in examining that question, AEDPA does not permit this Court to equate a

71

conclusion that the state's application of Remmer is incorrect to its being unreasonable.  See, e.g., Jackson, 133 S. Ct. at 1994.

The majority opinion concludes that the communication alleged here satisfies Remmer because "the spiritual or moral implications of" deciding whether to impose death "clearly" related to "the matter pending before the jury."  Maj. Op. at 42-43.  However, it offers no substantive basis for this conclusion grounded in Supreme Court precedent, nor does it grapple with arguments or theories that could have supported the state court's decision to the contrary.  In so doing, the majority opinion treats the issue before us as if it were here on direct appeal from the trial court and not a § 2254 petition constrained by AEDPA.  The majority opinion thus fails to undertake the appropriate review under AEDPA, see Harrington, 131 S. Ct. at 786, and fails to recognize the lack of clearly established Supreme Court case law mandating the interpretation of Remmer that it adopts.  In doing so, the majority transgresses the Supreme Court's admonition in Jackson against "collapsing the distinction between an unreasonable application of federal law" and what the majority now views as "an incorrect or erroneous application of federal law."  133 S. Ct. at 1994 (quoting Williams, 529 U.S. at 412); see also Harrington, 131 S. Ct. at 786 ("It bears repeating that even a strong case for

72

relief does not mean the state court's contrary conclusion was unreasonable.").

To determine what constraints Remmer posed generally—and specifically what reasonable interpretations of "the matter pending before the jury" might exist—I return to the controlling Supreme Court case law, beginning with Remmer. When that case returned to the Supreme Court, the Supreme Court explained that the earlier remand for an evidentiary hearing had been necessary because of "the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner[.]" Remmer v. United States, 350 U.S. 377, 379-80 (1956) (emphasis added). In light of the plain language in both Remmer decisions describing why the presumption and hearing were necessary in that case, it would not be "objectively unreasonable" for the state court to limit the scope of "the matter pending before the jury" to communication or contact suggesting how the juror should vote in a particular case.

The majority correctly posits that a state court may unreasonably apply Supreme Court precedent even where the Supreme Court has not issued an opinion involving a nearly identical fact pattern. See Maj. Op. at 36. Federal courts can grant habeas relief when state court adjudications are either "contrary to" or "unreasonable application[s] of" clearly

73

established Supreme Court precedent, § 2254(d)(1). The point, however, is that to prevail under § 2254, a petitioner must show more than just the misapplication of Supreme Court precedent or an erroneous decision. As set out earlier, AEDPA mandates a much higher bar, and where the Supreme Court has not spoken on a particular aspect of a claim, more room exists for a state court's adjudication of the claim to be reasonable. See, e.g., White, 2014 WL 1612424, at *6 (observing that "where the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims" (internal quotation marks omitted)); Renico, 559 U.S. at 773-79 (applying this standard where the state court and circuit court of appeals offered conflicting interpretations of the record, both of which were "reasonable" and concluding that the state court's adjudication was therefore not objectively unreasonable); Mitchell, 540 U.S. at 17-18 (discussing and applying why an erroneous state court decision is not an objectively unreasonable state court decision). Cf. supra at [2-5]. Applied to this case, it is a far cry from limiting Remmer to a nearly identical factual scenario (i.e., a potential bribe) to conclude that whatever defines the proper scope of "the matter pending before the jury," it does not extend to the allegations at issue here.

74

Returning to the actual allegations contained in Barnes' affidavits,[8] the only contact alleged to occur between the juror and her pastor is a conversation regarding whether jurors would face judgment from God if they sentenced someone to death. (J.A. 1892.) Nowhere in the affidavits supporting his claim does Barnes suggest that the pastor expressed his views of the death penalty either generally or as applied to this case. Neither do the affidavits support the claim that the pastor attempted to persuade the juror to vote for or against the death penalty, suggested that the Bible supported a particular sentence in this case, or exposed the juror to any extraneous information relevant to the juror's deliberative process. Rather, the substantive allegation in the affidavit regarding the juror's communication with her pastor is that the pastor

---

[8] I note that the relevant cross-reference should be to the allegations contained in the affidavits because at times Barnes' briefs on appeal allege a much broader third-party communication than can be reasonably inferred from the contents of the affidavits or his § 2254 petition. At times the majority makes this same error.

For this reason, too, the majority is mistaken in opining that the dissent is "focus[ing] not on what is alleged by Barnes, but rather on what is missing from his allegations." Maj. Op. at 45. As detailed above, Barnes' affidavits simply do not allege what either Barnes or the majority now claim that they do, and that point is made plain by looking to the actual allegations in those affidavits. What is missing from the affidavits simply highlights the dichotomy between what they do contain and other types of allegations that might bring the claim within Remmer's scope.

provided the juror with a Bible verse that "contradicted the passage relied upon by the defense attorney," which had "suggested that if jurors returned a death sentence, they, the jurors would one day face judgment for their actions." (J.A. 1892.)[9]

Numerous times throughout his § 2254 petition Barnes acknowledges that it is this issue—not the jury's choice of the appropriate sentence—which was the subject of the third-party contact. E.g., J.A. 1627 ("[A]n attorney for one of the co-defendants told the jury that sentencing a defendant to death would violate God's law and, perhaps, subject the jurors to

---

[9] The rest of Barnes' affidavits merely allege that the juror talked to her pastor (without alleging anything about what the conversation was about) or that jurors read from the Bible during jury deliberations. (J.A. 1892-1903; see also Dist. Ct. Op. at J.A. 2140 n.10.)

With respect to the former, the state court was not obliged to conclude that mere contact with the pastor—absent some attendant factual allegation that it involved communication "about the matter pending before the jury"—warranted either a presumption of prejudice or an evidentiary hearing. Indeed, the majority recognizes as much. But we arrive at different conclusions based on our different views of how to approach the state courts' interpretation of Barnes' evidence in light of Remmer.

With respect to the jurors reading from the Bible, these allegations are not before the Court as they are not part of the certificate of appealability. To the extent that Barnes alleges further prejudice arising from the juror's subsequent conversations during deliberations, that would be mere surplussage as improper third-party contact with even one juror would be sufficient to trigger Remmer's presumption, if that contact had otherwise fallen within Remmer's scope.

76

judgment one day. In response to this argument, one of the jurors . . . telephon[ed] her pastor and [sought] his advice about this argument. He referred her to a biblical passage that he claimed refuted the argument." (emphasis added)); 1629 ("[A] lawyer argued the jurors might themselves be judged by God if they returned a sentence of death. . . . In response to this argument, [a juror] contacted her pastor . . . and discussed it. [The pastor] gave her a biblical passage that he felt responded to the argument." (emphasis added)); 1631 ("[A] sitting juror . . . call[ed] her pastor during the sentencing deliberations and asked his advice about the biblical correctness of a defense closing argument. The pastor referred her to a passage [he] claimed refuted the argument." (emphasis added)). While Barnes also speculates and theorizes as to how the conversation impacted the deliberative process, he reaches far beyond the scope of the evidence before the state MAR court at the time it reviewed his claim in so doing. E.g., J.A. 1633-34 (asserting, among other things, that the pastor provided his view on the biblical support for the death penalty and gave the juror the "green light" to vote for death).

The North Carolina state MAR court could reasonably conclude that the type of communication at issue here did not constitute contact "about the matter pending before the jury" because it was not directed to the choice of sentence, life in

77

prison or death, that the jury was ultimately charged to determine. And Barnes' allegations can fairly be read as asserting that the juror and her pastor conversed about the religious implications of serving on a jury, or even serving on a jury in a capital case, but not about the appropriateness of any specific sentencing choice that the jury was charged to make regarding Barnes. Therefore, a fair-minded jurist could conclude that this type of communication was not "about the matter pending before the jury" under Remmer.[10]

In a similar vein, it would be objectively reasonable to view the "matter pending before the jury" as the state trial court's charge to the jurors to determine whether the appropriate sentence for Barnes under North Carolina law was life imprisonment or the death penalty. At no time did the state trial court charge jurors with deciding the eternal consequences to their soul that they could face as a result of

---

[10] The majority opinion posits that because the trial court did not instruct the jurors to disregard the closing argument, it was "squarely presented for the jury's consideration as part of their ultimate sentencing decision." Maj. Op. 44. Closing argument is not evidence, however. And while the jury instructions are not part of the joint appendix before this Court, the sentencing trial proceeded in accordance with the then-applicable provisions of N.C. Gen. Stat. § 15A-2000, which delineates specific criteria—based on the evidence presented to the jury—that the jurors are to use in deciding the appropriate sentence. See North Carolina v. Barnes, 481 S.E.2d 44, 51 (N.C. 1997) (describing Barnes' sentencing as proceeding "pursuant to" N.C. Gen. Stat. § 15A-2000).

following the court's instructions in making their sentencing decision. The provocative closing argument of Barnes' co-defendant did not alter "the matter" actually before the jury as instructed by the state trial court. Moreover, as the district court noted, the communication Barnes' affidavits allege to have occurred "expressed no opinion on the propriety of the death penalty and simply indicated that a Christian has a duty to follow the laws of the state, which, in the case of North Carolina, permitted a jury, in its discretion, to recommend that a convicted murderer like Barnes serve life in prison or be put to death[.]" Dist. Ct. Op. at J.A. 2143-44. Consequently, fair minded jurists can disagree as to whether the contact alleged in this case falls within Remmer's scope of contacts and communication "about a matter pending before the jury." As such, I do not believe that Barnes can point to Remmer's own parameters to satisfy his burden under AEDPA.[11]

---

[11] Notably, this Court's precedent would also permit such a reading of Remmer's "matter pending before the jury" language. In each instance where we have invoked the Remmer presumption following third-party communication with a juror, jurors encountered third parties who expressed their view of a party's culpability or appropriate sentence. E.g., Fullwood v. Lee, 290 F.3d 663, 676-84 (4th Cir. 2002) (remanding for an evidentiary hearing in a § 2254(d)(1) case where the petitioner proffered evidence that a juror's "strongly pro-death penalty" husband had repeatedly attempted to influence his wife to convict the petitioner and sentence him to death); United States v. Cheek, 94 F.3d 136, 140-44 (4th Cir. 1996) (reversing and remanding for a new trial based on the Remmer presumption based on juror-third (Continued)

79

The other Supreme Court decisions discussed above do not alter the conclusion that the state courts reasonably applied Remmer. As noted, neither Parker nor Remmer specifically expounded on the Remmer presumption even though they involved juror partiality claims. Parker, like Remmer, entailed third-party communication urging that jurors cast their vote in a particular manner. See Parker, 385 U.S. at 363-64. Turner is also readily distinguishable: even though the defendant did not allege that the two witness-deputies specifically spoke about

party contact the Court characterized as the juror's correct perception that the third party was attempting to bribe him); Stockton, 852 F.2d at 745-46 (holding that a third party's statement to jurors that he hoped "[they] fr[ied] the son-of-a-bitch" "bore on the exact issue – whether to impose the death penalty – that the jurors were deliberating at that time"); Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 487-89 (4th Cir. 1988) (invoking Remmer's presumption where the jury was exposed to statements from an individual who had been "inadvertently placed on [the] jury panel" during the first day of trial, "that he knew from his own experience that the plaintiff's testimony was correct and that he would vote to return a verdict against the defendants"); Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1534-38 (4th Cir. 1986) (invoking Remmer's presumption where the jury was exposed to statements from a nonjuror who had inadvertently sat on the jury during the first day of trial that he would "'be against the company' regardless of the evidence" given his personal familiarity with trucking companies). See also Untied States v. Basham, 561 F.3d 302 (4th Cir. 2009) (affirming district court's conclusion that the Government had rebutted the Remmer presumption of prejudice where juror was alleged to have telephoned multiple media outlets to provide information on the penalty phase deliberations). While these cases do not mean that Remmer could not be read more broadly, they equally support the view that Remmer could also reasonably be limited to such circumstances.

80

the case with the jurors during their close interactions facilitating the jury's sequestration, the Court's concern arose from these deputies being key prosecution witnesses in the case. Interaction of this duration, proximity, and intimacy between trial witnesses and jurors tainted the proceedings in a way that a single conversation with a non-witness would not inherently involve. See Turner, 379 U.S. at 474 ("It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were not deputy sheriffs. But the role that [they] played as deputies made the association even more prejudicial. . . . Turner's fate depended upon how much confidence the jury placed in these two witnesses."). Indeed, Turner did not rely directly on Remmer. For these reasons, Turner does not govern the state courts' adjudication of Barnes' claim.

Lastly, Smith—the only of these cases directly relying on Remmer—also involved an entirely different potential influence on a juror's decision making than that at issue here. The petitioner in Smith alleged that a juror was implicitly biased because he had submitted an employment application with the prosecutor's office during the trial. Relevant to this case, Smith reiterated that the due process concern was in maintaining "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent

prejudicial occurrences and to determine the effect of such occurrences when they happen." 455 U.S. at 217. Because Smith involved a juror's implied, internal bias rather than prejudice arising from specific third-party contact, it did not refine Remmer's guidance regarding what type of communication is "about the matter pending before the jury" or when the Remmer presumption is invoked as a result of such contact.

In short, none of these cases alters the basic proposition contained in Remmer regarding what sort of communication comprises "the matter pending before the jury." For these reasons, I conclude that the North Carolina state courts could reasonably conclude that the communication alleged here was not "about the matter pending before the jury" such that it triggered Remmer's presumption of prejudice. And because the state courts could reasonably conclude that the Remmer presumption did not apply to Barnes' claims, they did not err in denying him an evidentiary hearing.

E.

I believe the majority's analysis with respect to Barnes' evidentiary hearing claim suffers from other analytical errors as well. The majority concludes that the state courts "greatly distorted Barnes' burden, requiring" him to "present evidence that a juror was actually biased and that Barnes was therefore

82

actually prejudiced by the unauthorized communication." Maj. Op. at 41. This conclusion misses the point underlying the state courts' denial of Barnes' claims in several ways.

First, the state MAR court did not mention prejudice in its brief analysis of this issue. Instead, it concluded that the issue was procedurally barred and lacked merit because Barnes' new evidence "add[ed] nothing to the issue as it was presented during [his] original appeal, and the allegations are subject to the same analysis inherent in that decision." (J.A. 1883.) The state MAR court did not require more of Barnes than Remmer demands, nor did it distort the appropriate analysis.

To the extent it adopted the North Carolina State Court's view, that court's statements regarding the lack of prejudice flowed directly from its view of the nature of the communication alleged to have occurred. See J.A. 1854-55; 1882-83.[12] That inquiry is properly part of Barnes' initial burden of submitting sufficient support for his allegations so as to trigger the

---

[12] The North Carolina Supreme Court held that "[t]he trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty. Nothing in this assertion involved 'extraneous information' as contemplated in our Rule 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case." (J.A. 1854-55.)

protections discussed in Remmer.  It was not enough for Barnes to allege "contact between a juror and her pastor," Barnes also needed to present a credible allegation that this contact was "about a matter pending before the jury."  Denying the Remmer presumption of prejudice or an evidentiary hearing based on the conclusion that the communication alleged did not call into question the integrity of the verdict, i.e., did not concern the "matter pending before the jury," fully complies with Remmer.

To that end, this Court has previously recognized that it is the petitioner's initial burden to show prejudicial contact in considering whether Remmer's presumption of prejudice has been triggered.  See Blauvelt, 638 F.3d at 295 (holding that the Remmer presumption did not apply where the communication was innocuous and the defendant "ha[d] failed to present evidence that the communication was prejudicial"); Wolfe, 565 F.3d at 162 (holding that "the state court's conclusion that Wolfe failed to show a prejudicial influence on the jury's deliberations was not objectively unreasonable").  The North Carolina state courts thus properly analyzed Barnes' allegations for their potentially prejudicial nature in order to determine whether they were sufficient to trigger Remmer.  Contrast supra Maj. Op. at 41-42 (criticizing the state MAR Court for "demand[ing] proof of a Sixth Amendment violation – that is, proof of juror bias – before Barnes was entitled to any relief").

84

Even more fundamentally, though, under AEDPA, we are not constrained by the state courts' rationale in assessing whether its holding should nonetheless be upheld. Indeed, the state courts' decision need not provide <u>any</u> statement of reasons to nonetheless create a presumption that a claim was "adjudicated on the merits" and thus subject to § 2254(d) review. <u>Harrington</u>, 131 S. Ct. at 784-85. Federal courts review the "state court's determination that a claim lacks merit," not solely the rationale it provides for that determination. <u>See id.</u> at 786; <u>see also</u> <u>Wolfe</u>, 565 F.3d at 162 (observing that when a state court adjudicates a claim on the merits, federal courts must apply AEDPA's deferential standard of review to the decision, even when the court does not set forth the legal principles, precedents, or rationale for its decision); <u>Robinson</u>, 438 F.3d at 358 ("In assessing the reasonableness of the state court's application of federal law, therefore, the federal courts are to review the <u>result</u> that the state court reached, not whether its decision was well reasoned." (internal quotation marks and alterations omitted)).

In order for Barnes to prevail, it is not enough for the majority to conclude that the state courts' analysis erred in considering Barnes' burden as to prejudice. Rather, the majority needed to consider whether any reading of the record and <u>Remmer</u> could support the decision to deny a presumption of

prejudice and evidentiary hearing, even if the state courts' stated rationale was inadequate or flawed. See Harrington, 131 S. Ct. at 786. AEDPA demands no less.

## II.

For the reasons set forth above, I conclude that "fairminded jurists could disagree" as to whether the communication Barnes alleges to have occurred constituted juror contact with a third party "about a matter pending before the jury." Neither Remmer nor any subsequent Supreme Court case has explored the applicability of the Remmer presumption to allegations that a juror's conversation with a third party did not directly bear upon how the juror would vote. Given that Remmer expressed only a general principle, and the Supreme Court has recognized that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations," Harrington, 131 S. Ct. at 786, I believe that AEDPA's standard of review settles the Court's inquiry in this case.

If this case was before the Court on a direct appeal, a different analysis would be required to determine whether Barnes could be entitled to any relief under Remmer. But that is not the posture of the case before the Court, and our review under AEDPA is only whether the North Carolina state courts could

86

reasonably conclude that Remmer did not require either a presumption of prejudice or an evidentiary hearing. Given the ambiguities in interpreting what constitutes a "matter pending before the jury" and a reasonable basis for distinguishing the applicable Supreme Court precedent, we are constrained by AEDPA. See Mitchell, 540 U.S. at 18; Robinson, 438 F.3d at 355 ("The state court's application of clearly established federal law must be 'objectively unreasonable,' and 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" (quoting Williams, 529 U.S. at 411)).

Because I would hold that the North Carolina state courts did not unreasonably apply Remmer by concluding that the contact alleged in Barnes' affidavits did not trigger a presumption of prejudice, I would affirm the district court's denial of Barnes' § 2254 petition. Accordingly, I respectfully dissent.